LOS ANGELES BRANCH NAACP et al., Plaintiffs-Appellees,

v.

LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants-Appellants.

No. 81–5772.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 1984.

Decided Dec. 21, 1984.

As Modified on Denial of Rehearing and Rehearing En Banc Feb. 21, 1985.

Sneed, Circuit Judge, concurred in part and dissented in part with opinion in which Choy, Wallace and J. Blaine Anderson, Circuit Judges, joined.

Poole, Circuit Judge, concurred in part and dissented in part with opinion.

Pregerson, Circuit Judge, concurred with opinion in which Nelson, Circuit Judge, joined.

Thomas I. Atkins, General Counsel, N.A. A.C.P. Special Contribution Fund, Brooklyn, N.Y., for plaintiffs-appellees.

G. William Shea, Peter W. James, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendants-appellants.

Before BROWNING, Chief Judge, CHOY, WALLACE, SNEED, ANDERSON, PREGERSON, POOLE, NELSON, CANBY, BOOCHEVER and NORRIS, Circuit Judges:

CANBY, Circuit Judge:

We took this case en banc to decide the extent to which the doctrine of res judicata bars this class action alleging intentional segregation in the Los Angeles public schools in violation of the United States Constitution. Defendants moved in district court for summary judgment on the ground that plaintiffs were seeking in this action to relitigate the same claim that had been litigated and decided in *Crawford v. Board of Education*, 113 Cal.App.3d 633, 170 Cal.Rptr. 495 (1980), *aff'd*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). The district court denied the motion, 518 F.Supp. 1053, and certified this interlocutory appeal. 28 U.S.C. § 1292(b).

## I.

### FACTS

The *Crawford* litigation began in 1963 as a class action on behalf of black high school students seeking to desegregate a high school in Los Angeles. Before trial, the complaint was amended to assert a desegregation claim on behalf of all black and Hispanic students attending school in the Los Angeles Unified School District. The case was filed in the California courts just months after the California Supreme Court, in *Jackson v. Pasadena City School District*, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963), held that school boards in the state were under a state constitutional obligation to take reasonable steps to alleviate racial segregation in the schools, regardless of whether the segregation was de facto or de jure in nature. The case went to trial in 1968 under a stipulation that permitted the court to consider activities of the defendants occurring from May 1, 1963 to the time of trial. The trial court rendered its decision on May 12, 1970, finding that the District schools were substan-

tially segregated and concluding that this segregation was both de facto and de jure in origin.

On appeal, the California Supreme Court refused to affirm on the basis of the trial court's conclusion of de jure segregation. *Crawford v. Board of Education*, 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976) (*Crawford I*). Instead, it chose to affirm on the basis of its previous decision in *Jackson* that the California Constitution imposed a duty upon school boards to take reasonably feasible steps to alleviate segregation in the public schools, regardless of its cause. *Id.* at 301–02, 130 Cal.Rptr. at 738, 551 P.2d at 42. The court then remanded the cause to the trial court for the development of a reasonably feasible desegregation plan.

On remand, the trial court rejected the largely voluntary desegregation plan submitted by the School District and ordered the implementation of a plan calling for large-scale mandatory pupil reassignment and transportation. The court-ordered plan went into effect in the fall of 1978. In October 1979, the trial court began hearings to determine the constitutional sufficiency of its court-ordered plan. On November 6, 1979, before the hearings could be completed, the voters of California approved Proposition I,[1] an initiative measure which amended the California Constitution to limit the power of state courts to order mandatory pupil reassignment and transportation on the basis of race. In effect, the state courts were forbidden to order those measures except in circumstances where federal courts could do so to remedy violations of the United States Constitution. In addition, Proposition I authorized any court having jurisdiction, upon application by any interested person, to modify existing judgments or decrees containing provisions for mandatory pupil reassignment and transportation, unless such modification would be prohibited by the United States Constitution.

Following passage of Proposition I, the School District applied to the California courts for an order halting mandatory pupil reassignment and transportation in the District. On May 19, 1980, the Superior Court denied the application on the ground that the trial court in *Crawford I* had found de jure segregation and thus the elimination of mandatory pupil reassignment and transportation in the District would be prohibited by the United States Constitution. The Superior Court thereafter issued a new order on July 7, 1980, substantially continuing the 1978 desegregation plan.

The California Court of Appeal reversed and vacated the July 7, 1980, desegregation order. *Crawford v. Board of Education*, 113 Cal.App.3d 633, 643, 170 Cal.Rptr. 495

---

**1.** Proposition I amended art. 1, § 7(a) of the California Constitution which now provides, in relevant part:

(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; provided, that nothing contained herein or elsewhere in this Constitution imposes upon the State of California or any public entity, board, or official any obligation or responsibilities which exceed those imposed by the Equal Protection Clause of the 14th Amendment to the United States Constitution with respect to the use of pupil school assignment or pupil transportation. In enforcing this subdivision or any other provision of this Constitution, no court of this state may impose upon the State of California or any other public entity, board or official any obligation or responsibility with respect to the use of pupil school assignment or pupil transportation, (1) except to remedy a specific violation by such party that would also constitute a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution and (2) unless a federal court would be permitted under federal decisional law to impose that obligation or responsibility upon such party to remedy the specific violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

Except as may be precluded by the Constitution of the United States, every existing judgment, decree, writ, or other order of a court of this state, whenever rendered, which includes provisions regarding pupil school assignment or pupil transportation, or which requires a plan including any such provisions shall, upon application to a court having jurisdiction by any interested person, be modified to conform to the provisions of this subdivision as amended, as applied to the facts which exist at the time of such modification.

(1980) (*Crawford II*). The appellate court determined that the 1970 findings by the trial court in *Crawford I* did not support its conclusion of de jure segregation, when viewed in light of subsequent Supreme Court decisions emphasizing the need for showing specific discriminatory intent. Because the Court of Appeal viewed the findings as establishing only de facto segregation in the District schools, it concluded that a federal court would not be authorized under federal law to order pupil assignment and transportation. Consequently, Proposition I barred the state court from doing so. The court thereupon vacated the orders of May 19, 1980, and July 7, 1980, and remanded to the Superior Court "for further proceedings consistent with this opinion." The California Supreme Court refused review on March 11, 1981, and the case was remitted to the Superior Court on the next day.[2]

Following the remittitur,[3] the District submitted a revised desegregation plan with no mandatory pupil reassignment or mandatory busing. The plan was accepted by the Superior Court, with modifications, on September 10, 1981. On November 25, 1981, the Superior Court awarded plaintiffs attorneys' fees and costs and, declaring that the "underlying issues have been resolved," terminated jurisdiction. The *Crawford* plaintiffs appealed the September 10, 1981 order but dropped their appeal on May 24, 1983, thus closing the last chapter of the *Crawford* litigation.[4]

The NAACP filed the present case while *Crawford* was still pending in the California Superior Court following the remittitur from *Crawford II*. The district court refused to give res judicata effect to the *Crawford* litigation because it determined that no final judgment had yet been entered in that case and that retrial of the de jure issue on remand had not been foreclosed by the appellate court's remittitur.[5] A three-judge panel of this court reversed the district court on the ground that the *Crawford* judgment had since become final and that therefore relitigation of the claim that the District was segregated de jure on or before September 10, 1981, was barred by the doctrines of res judicata and collateral estoppel.[6] We granted the NAACP's petition for rehearing en banc and withdrew the opinion of the three-judge panel.[7] Because we agree that relitigation of the de jure claim is barred by the doctrine of res judicata, we reverse the order of the district court. We determine the bar, however, to apply only to events occurring on or before May 2, 1969.

## II.

### *Res Judicata*

 The state court judgment in the *Crawford* litigation is entitled to the same preclusive effect in this court as it would be accorded in a California court, whether the effect is one of claim preclusion or issue preclusion. 28 U.S.C. § 1738; *Migra v. Warren City School District Board of Education*, —— U.S. ——, 104 S.Ct. 892, 896–98, 79 L.Ed.2d 56 (1984). Under Cali-

---

**2.** The United States Supreme Court granted certiorari limited to the question of the constitutionality of Proposition I. *See Crawford v. Board of Education*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982). The plaintiffs did not seek review of the Court of Appeal's conclusion that de jure segregation had not been proved.

**3.** In California, the term "remittitur" refers to the mandate of the appellate court. Remittitur has the effect of transferring jurisdiction to the trial court. 6 Witkin, *California Procedure*, Appeal Part I, §§ 516–518 (1971).

**4.** *Crawford v. Board of Education*, No.2d Civil 67706 (Cal.Ct.App. May 24, 1983). The District

appealed the November 25, 1981 award of attorneys' fees. That appeal has since been dismissed pursuant to a stipulated order entered April 16, 1984. Therefore, all issues arising out of the Crawford proceedings have now been finally resolved.

**5.** *Los Angeles Branch NAACP v. Los Angeles Unified School District*, 518 F.Supp. 1053 (C.D.Cal. 1981).

**6.** *Los Angeles Unified School District v. Los Angeles Branch NAACP*, 714 F.2d 935 (9th Cir. 1983).

**7.** 725 F.2d 1257 (9th Cir.1984).

fornia law, the claim preclusion aspect of res judicata, also referred to as bar or merger, precludes the maintenance of a second suit between the same parties on the same cause of action so long as the first suit concluded in a final judgment on the merits. *Agarwal v. Johnson,* 25 Cal.3d 932, 954, 160 Cal.Rptr. 141, 155, 603 P.2d 58, 72 (1979); *Slater v. Blackwood,* 15 Cal.3d 791, 795, 126 Cal.Rptr. 225, 226, 543 P.2d 593, 594 (1975). All issues that were litigated or that might have been litigated as part of the cause of action are barred. *Olwell v. Hopkins,* 28 Cal.2d 147, 152, 168 P.2d 972, 975 (1946). The parties no longer dispute that there is now a final judgment on the merits in *Crawford.* We therefore turn our attention to the more complex problem of determining whether this action involves the same cause of action and the same parties as *Crawford.*

## A.

### Identity of Claims

The plaintiffs argue that the claim sued upon in this action is not the same as that in *Crawford.* They contend that the *Crawford* plaintiffs sued for violation of a right arising under the state constitution—the right to be free of de facto segregation. Plaintiffs assert that here they are suing for violation of a right arising under the Federal Constitution—the right to be free of de jure segregation. There are at least two major flaws in plaintiffs' argument.

■ First, the record in *Crawford* simply does not support the contention that plaintiffs there confined their claim to de facto segregation in violation of state law. The *Crawford* plaintiffs pleaded violations of the Fourteenth Amendment. They successfully moved the state court to be allowed to show bad faith on the part of the School District in maintaining segregation in the schools, injecting the element of defendants' intent into the trial. The findings and conclusions of the state trial judge directly addressed de jure segregation as a violation of the Federal Constitution. It is true that the California Supreme Court in *Crawford I* chose not to rely on the de jure

findings, but that fact did not permanently remove the de jure issue from the case. When the School District moved to modify the desegregation plan after the passage of Proposition I, the *Crawford* plaintiffs responded in a memorandum of April 23, 1980, to the state trial court: "In *Crawford,* the Court heard and decided the Fourteenth Amendment issues and defense, and found de jure segregation. The violations and defense were pleaded, argued, and decided. They cannot now be relitigated by invasion of the final judgment." Thereafter, the California Court of Appeal addressed the de jure issue and held that the trial court's 1970 findings did not support a conclusion of de jure segregation. 113 Cal. App.3d at 645–46, 170 Cal.Rptr. at 503–04. The de jure issue had to be addressed at that time in order to determine the effect of Proposition I on the existing desegregation plan that included mandatory pupil reassignment and transportation. In view of this record, it is not possible to accept the contention of plaintiffs here that the *Crawford* litigation had nothing to do with de jure segregation in violation of the United States Constitution.

■ The second major flaw in plaintiffs' argument is that it misconceives the scope of a cause of action under California law. As plaintiffs correctly point out, California follows the "primary rights" theory, under which the right sought to be enforced determines the cause of action. *See* 3 Witkin, California Procedure, Pleadings § 22 (1971). The invasion of more than one primary right gives rise to as many causes of action as rights violated, even though all may arise from a single set of facts. *See, e.g., Sawyer v. First City Financial Corp.,* 124 Cal.App.3d 390, 399, 177 Cal.Rptr. 398, 403 (1981). California's rule, however, does not mean that different causes of action are involved just because relief may be obtained under either state or federal law, or under either of two legal theories. *See Boccardo v. Safeway Stores, Inc.,* 134 Cal.App.3d 1037, 1043, 1054, 184 Cal.Rptr. 903, 907, 914 (1982); *City of Los Angeles v. Superior Court,* 85 Cal.App.3d 143, 150,

152, 149 Cal.Rptr. 320, 325 (1978). Two recent California cases illustrate the distinction. In *Mattson v. City of Costa Mesa*, 106 Cal.App.3d 441, 447, 164 Cal. Rptr. 913, 917 (1980), the plaintiff had previously brought a federal civil rights action alleging assault and wrongful arrest. He then brought an action in state court alleging that the same conduct constituted the common law tort of negligence. The California Court of Appeal held that the second action was barred because both actions sought redress for injury to plaintiff's interest in personal security and integrity. To be contrasted with *Mattson* is *Agarwal v. Johnson*, 25 Cal.3d 932, 954, 160 Cal. Rptr. 141, 155, 603 P.2d 58, 72 (1979). There plaintiff first brought suit in federal court for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. He subsequently was permitted to sue his employer in state court for the common law torts of defamation and intentional infliction of emotional distress arising out of the same discriminatory employment practice. The California Supreme Court held that the federal action was brought to remedy the economic loss in wages, while the state action was brought to redress injuries to the different interests in reputation and peace of mind. As both *Mattson* and *Agarwal* indicate, the single most important factor in determining whether a single course of conduct has violated more than one primary right is whether plaintiff suffered injury to more than one interest. *See also Ford Motor Co. v. Superior Court*, 35 Cal.App.3d 676, 679, 110 Cal.Rptr. 59, 61 (1973).

 In light of these decisions, we are unable to accept plaintiffs' contention that they are attempting to enforce a different primary right than were the plaintiffs in *Crawford*. We would adhere to that conclusion even if the *Crawford* litigation had

been confined to de facto segregation in violation of state law. The right to be free from de facto segregation is not a thing apart from the right to be free from de jure segregation; the former necessarily encompasses the latter. The California Supreme Court in *Crawford I* held that school boards had an affirmative duty to take reasonable steps to eliminate both de facto and de jure segregation. 17 Cal.3d at 301–02, 130 Cal.Rptr. at 738, 551 P.2d at 42. That duty survived Proposition I. *Crawford II*, 113 Cal.App.3d at 655, 170 Cal. Rptr. at 510. The California Supreme Court clearly regarded the injury from both kinds of segregation to be the same: "[T]here is virtually no dispute that the practical effect of segregated schooling on minority children does not depend upon whether a court finds the segregation de jure or de facto in nature; the isolation and debilitating effects do not vary with the source of the segregation." *Crawford I*, 17 Cal.3d at 301, 130 Cal.Rptr. at 737–38, 551 P.2d at 41–42. *See also Keyes v. School District No. 1*, 413 U.S. 189, 229–30 & n. 14, 93 S.Ct. 2686, 2707–08 & n. 14, 37 L.Ed.2d 548 (1973) (Powell, J., concurring). We can only conclude that California regards the primary right underlying de jure and de facto claims to be one and the same—"the right to an equal opportunity for education." [8] *Crawford I*, 17 Cal.3d at 305, 130 Cal.Rptr. at 740, 551 P.2d at 44. *See also Crawford II*, 113 Cal.App.3d at 649, 170 Cal.Rptr. at 506. Since the primary right enforced in *Crawford* was the same as the primary right asserted in this litigation, the present action is barred as to all matters that might have been litigated by the same parties in *Crawford*.

 Our conclusion that the same primary right is involved also puts to rest the contention that the federal claim is not

---

**8.** The distinction between de facto and de jure segregation is not unlike that between intentional torts and those involving negligence or strict liability. In each case, the difference consists only in the nature of the defendant's state of mind, and not in the nature of the harm suffered by the plaintiff. It is for this reason that the "primary rights" theory recognizes only one

cause of action for a single personal injury regardless of whether defendants' liability might be grounded on several tort theories. *See, e.g., Slater v. Blackwood*, 15 Cal.3d at 791, 126 Cal. Rptr. at 225, 543 P.2d at 594–95; *Panos v. Great Western Packing Co.*, 21 Cal.2d 636, 134 P.2d 242 (1943). By analogy, the same principle is applicable here.

barred because the federal right is narrower than the state right. It is true that federal law does not place school boards under a duty to alleviate de facto segregation. *See Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 435–36, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The right to desegregate is therefore greater under California law than under the Federal Constitution, as the Supreme Court observed in *Crawford v. Board of Education,* 458 U.S. 527, 535, 102 S.Ct. 3211, 3216, 73 L.Ed.2d 948 (1982). But the doctrine of res judicata, in California as elsewhere, not only bars the maintenance of the identical cause of action in a subsequent suit by the same parties. It also bars the maintenance of a subsequent action *on any part* of the original cause of action, even if that part was not litigated in the prior action. Restatement of Judgments § 62 (1942), *cited with approval in Mattson v. City of Costa Mesa,* 106 Cal. App.3d at 449, 164 Cal.Rptr. at 918. Similarly, a plaintiff with a claim supported by both state and federal law may not bring separate actions on each ground; the first action precludes the second if the first court had jurisdiction to adjudicate both grounds. *Migra v. Warren City School District Board of Education,* 104 S.Ct. at 898; Restatement (Second) of Judgments § 61.1 comment e (1982).

■■■ Res judicata claim preclusion does not, of course, bar plaintiffs from litigating matters that were not within the scope of the claim litigated in *Crawford.* The *Crawford* claim necessarily included all segregative acts of the District occurring prior to commencement of the *Crawford* litigation in August 1963. *See* Restatement (Second) of Judgments § 24, comment d, § 26, comment h (1980). The stipulation of the parties, accepted by the

trial court, extended the scope of the claim to cover the period from 1963 to the time of trial. The trial court considered the effects of School District inaction up to the end of the trial, and the California Supreme Court in affirming in *Crawford I,* characterized the trial court's findings and conclusions as covering the "relevant time period—which ran through the conclusion of the trial in May 1969." 17 Cal.3d at 288, 130 Cal.Rptr. at 728, 551 P.2d at 32. We conclude, therefore, that segregative acts occurring before the close of the *Crawford* trial of the merits on May 2, 1969 fall within the bar of res judicata.

■■■ It has been argued, and the three judge panel of this court held, that the bar of the *Crawford* litigation must extend to all segregative acts occurring prior to September 10, 1981, the date that trial court terminated the litigation on the merits and discharged the writ of mandate. We reject that position. The scope of litigation is framed by the complaint at the time it is filed. The rule that a judgment is conclusive as to every matter that might have been litigated "does not apply to new rights acquired pending the action which might have been, but which were not, required to be litigated." *Kettelle v. Kettelle,* 110 Cal.App. 310, 312, 294 P. 453, 454 (1930); see *Lord v. Garland,* 27 Cal.2d 840, 849, 168 P.2d 5, 11 (1946); *Brown v. Brown,* 170 Cal. 1, 4, 147 P. 1168, 1170 (1915); *Metropolis Trust & Savings Bank v. Barnet,* 165 Cal. 449, 452–53, 132 P. 833, 834 (1913). Plaintiffs may bring events occurring after the filing of the complaint into the scope of the litigation by filing a supplemental complaint with leave of court, Cal.Civ.Proc.Code § 464, but there is no requirement that plaintiffs do so.[9] The stipulation of the parties that permitted the court to consider events occurring from

---

9. In equity, a court in fashioning its decree may take into account facts occurring after the filing of the complaint, and no supplemental pleading is required. *Collins v. Sargent,* 89 Cal.App. 107, 112–113, 264 P. 776, 779 (1928). While that rule may often accomplish the purpose of avoiding further litigation, we view its primary function as one of insuring realistic relief. *See* note 10, *infra.* We have been referred to no cases where

the rule was extended to bar subsequent litigation of claims that arose during previous litigation but were not made the subject of supplemental pleadings. We decline to impose a potentially unworkable requirement that every claim arising prior to entry of a final decree must be brought into the pending litigation or lost.

1963 to the time of trial was clearly intended to operate as a supplemental pleading, but it specified that "[t]he rights of petitioners, if any, and the duties of respondent, if any, shall be determined as of the time of trial." It therefore cannot have extended the durational scope of the litigation past the close of trial of the merits on May 2, 1969—the date that the California Supreme Court stated to be the end of the period relevant to the trial court's findings and conclusions.

If the *Crawford* plaintiffs had actually litigated the liability of the District for segregative acts occurring after May 2, 1969, then the res judicata bar would have to expand to encompass those events and others that might have been litigated with them. The record indicates, however, that the *Crawford* plaintiffs did not so open the litigation to later events. Judge Gitelson entered his findings and conclusions on May 12, 1970. The California Supreme Court affirmed on June 28, 1976 (*Crawford I*). The case was then remanded for the adoption and approval of a desegregation plan. All further proceedings were concerned entirely with the appropriateness and legality of various Board plans, before and after passage of Proposition I.

■ It is true that the *Crawford* plaintiffs litigated the constitutionality of Proposition I, but that was an argument over remedy, not right. Indeed, the plaintiffs' memorandum of December 19, 1979, contended that Proposition I was unconstitutional because it retroactively deprived plaintiffs of the benefits of the 1970 findings and mandate, which they contended were res judicata.

The decision in *Crawford II* on December 19, 1980, was entirely a review of the 1970 findings and conclusions. It did not purport to deal with any school board actions subsequent to that time. After the remittitur, plaintiffs contended in the trial court that the Board resolution of March 16, 1981, was unconstitutional, by its own force and because it violated the mandates of *Crawford I* and *II*. The unconstitutionality of the Board resolution was urged not as a new source of liability, but as a ground for holding the Board's plan to be improper as relief.

The two final orders in the *Crawford* litigation drive the point home further. Judge Lopez' order of September 10, 1981, which ended the litigation on the merits, held that the Board had "satisfied the mandate of the Court issued on May 19, 1970," as interpreted in *Crawford I* and *II*, and accordingly discharged the writ of mandate. In his final order awarding attorneys' fees and terminating jurisdiction on November 25, 1981, Judge Lopez recited that the case could best be thought of in two parts: the first relating to the "trial of the right of the children to a desegregated education" that ended in a judgment affirmed in 1976, and the second the enforcement of that judgment. "Since 1976, this case has been in the remedy enforcement phase. The sole task before the Court was the supervision of the evolution and adoption of a Plan for desegregation. No rights were at issue." [10]

The *Crawford* record therefore supports the view that the scope of the claim litigated in that case did not include any segregative acts of the District occurring after May 2, 1969. The claim preclusion bar of Crawford therefore extends only to segregative acts occurring on or before May 2, 1969. Any acts of de jure segregation committed by defendants after that date are not precluded and may be pursued by plaintiffs in this litigation. In such ensuing proceedings, the parties may introduce

---

**10.** Proposition I is framed as a limitation upon remedy. For that reason, we do not accept the view put forth in Judge Sneed's partial dissent that Proposition I caused the entire factual case on liability to be reopened and supplemented upon the Board's post-Proposition application to modify the original decree. Any desegregation decree, original or modified, must take current facts into account to insure that the decree is properly tailored to remedy the violation of right that was pleaded and proved. That is the sense in which we read the requirement of Proposition I that decrees be modified to conform to the Proposition "as applied to the facts which exist at the time of the modification." It is apparent from the remarks of Judge Lopez quoted above that he held a similarly limited view of the purpose of the post-Proposition I proceeding.

evidence of events occurring on or before May 2, 1969, so long as it is relevant to a claim of de jure segregative acts committed by defendants after that date. They may not, however, relitigate any claim that the District had committed de jure segregation on or before May 2, 1969. *See Bronson v. Board of Education*, 525 F.2d 344, 350 (6th Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976).

## B.
### Identity of Parties

A judgment on behalf of a class binds all persons belonging to the class and all those who subsequently come into the class. *King v. International Union of Operating Engineers*, 114 Cal.App.2d 159, 164–65, 250 P.2d 11, 14 (1952); *see Cooper v. Federal Reserve Bank of Richmond*, —— U.S. ——, ——, ——, 104 S.Ct. 2794, 2798, 2802, 81 L.Ed.2d 718 (1984). The plaintiff class in *Crawford* consisted of all black and Hispanic children attending school in the Los Angeles Unified School District.[11] It is clear from the final order of the state trial court on September 10, 1981, that the class remained open to that date, because the relief encompassed, and was intended to benefit, black and Hispanic children in school on that date.

The class certified in the present action includes all existing and future black students who are or become eligible to attend the District's schools during the pendency of this action. The present class therefore comprises some members who were also members of the Crawford class and others who were not. The former are clearly bound by *Crawford* under the traditional application of res judicata; the latter are not. *See* 3 Witkin, *supra*, Judgments § 282. California has expanded the traditional rule, however, to apply the preclusive effect of a prior judgment to nonparties whose interests were "virtually represented" by one of the parties to the litiga-

tion. *See e.g., Rynsburger v. Dairymen's Fertilizer Corp.*, 266 Cal.App.2d 269, 278, 72 Cal.Rptr. 102, 107–08 (1968); *King v. International Union of Operating Engineers*, 114 Cal.App.2d at 164, 250 P.2d at 13. The nonparty is bound under the rule if he was "so far represented by others that his interest received actual and efficient protection." *Rynsburger*, 266 Cal. App.2d at 278, 72 Cal.Rptr. at 107; *see also Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.1975). The application of this doctrine to desegregation cases is particularly appropriate. It has been recognized that unless subsequent generations of school children are bound by preclusion rules from relitigating identical claims of unlawful segregation, those claims would assume immortality. *See, e.g., Bell v. Board of Education*, 683 F.2d 963, 966 (6th Cir.1982); *Bronson v. Board of Education*, 525 F.2d 344, 349 (6th Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976).

We see no reason why the California courts would not apply the doctrine of virtual representation here to preclude post-1981 black school children from litigating any part of the cause of action litigated in *Crawford*. There is no contention by plaintiffs that the *Crawford* class was inadequately represented. Nor have they made any showing that the interests of the two classes are different. Although Proposition I limited the remedies available to the state courts for alleviating de facto segregation, it did not alter the substantive right that had been recognized in *Jackson* and *Crawford I*. *Crawford II*, 113 Cal. App.3d at 655–56, 170 Cal.Rptr. at 509–10. The relief granted and the relief available in *Crawford* would not have changed its character had all the members of the present plaintiff class been parties.

We conclude, therefore, that the California courts would give preclusive effect to

---

11. The class in *Crawford* was never formally certified. No procedure for such certification existed in California prior to 1973. The California courts treated *Crawford* as a class action throughout, *see Crawford I*, 17 Cal.3d at 286, 551 P.2d at 31, 130 Cal.Rptr. at 727; *Crawford II*, 113 Cal.App.3d at 647–50; 70 Cal.Rptr. at 504–

06. We therefore treat it as a class action for purposes of res judicata. *See Jackson v. Hayakawa*, 605 F.2d 1121, 1126 & n. 7 (9th Cir.1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *see also Johnson v. General Motors Corp.*, 598 F.2d 432, 434–35 (5th Cir. 1979).

the *Crawford* judgment against all plaintiffs in this case as to any claim of unlawful segregative actions taken by the School District on or before May 2, 1969. We can give *Crawford* no less effect than California would. 28 U.S.C. § 1738.

### III.

### Full And Fair Opportunity

It is suggested that although ordinary claim preclusion rules might bar the relitigation of pre-1969 de jure segregation, they should not be applied in this case because to do so would constitute manifest injustice. The injustice that is urged is that there was no full and fair opportunity to litigate the de jure claim in *Crawford.* There is authority in California for the proposition that a court may refuse to apply res judicata where to do so would defeat the ends of justice. *See, e.g., Greenfield v. Mather,* 32 Cal.2d 23, 35, 194 P.2d 1, 8 (1948). Although the California Supreme Court has questioned the current validity of the *Greenfield* rule, it has not expressly overruled it. *See Slater v. Blackwood,* 15 Cal.3d at 796, 126 Cal.Rptr. at 227, 543 P.2d at 595. The lower California courts have continued to apply the rule, at least where there was no meaningful opportunity to litigate the claim in the prior action. *See, e.g., Ruddock v. Ohls,* 91 Cal. App.3d 271, 281, 154 Cal.Rptr. 87, 91 (1979); *Hight v. Hight,* 67 Cal.App.3d 498, 136 Cal.Rptr. 685 (1977). *See also Ackerman v. Ackerman,* 676 F.2d 898, 905 (2d Cir. 1982) (applying California preclusion law pursuant to 28 U.S.C. § 1738). Whether or not *Greenfield* remains good law in California,[12] it does not apply in this case because plaintiffs had a full and fair opportunity to litigate their claim in *Crawford;* giving effect to the *Crawford* judgment consequently would not cause manifest injustice.

Plaintiffs contend that *Jackson v. Pasadena City School District,* decided just before the *Crawford* action was initiated, deprived the *Crawford* plaintiffs of any incentive to litigate the de jure question.

*See Ackerman,* 675 F.2d at 905 (no meaningful opportunity when plaintiff lacked any incentive to litigate). It is questionable that the *Crawford* plaintiffs would have read so expansively the dicta in *Jackson* that "under some circumstances" a student whose school was racially imbalanced solely because of residential segregation would be entitled to relief, and that school boards must take steps "insofar as reasonably feasible" to alleviate racial imbalance regardless of its cause. *Jackson,* 59 Cal.2d at 881, 882, 31 Cal.Rptr. at 609, 610, 382 P.2d at 881, 882. It is true that these dicta were strengthened and adopted as holding in *Crawford I* itself, but the plaintiffs could not have been assured of that result in advance. With only *Jackson* as authority, plaintiffs retained substantial incentive to prove de jure segregation to obtain the most certain and comprehensive relief. That incentive is reflected in plaintiffs' successful motion to preserve for trial the "bad faith" of the school board in "knowingly, deliberately and intentionally" following a course of action that "had the effect, and continues to have the effect, of maintaining and perpetuating a racially segregated and imbalanced school system." ER 4, Exh. 5. It is also reflected in the trial court's findings and conclusions regarding de jure segregation.

Even if we were to assume that the *Crawford* plaintiffs lacked the incentive fully to litigate the de jure claims prior to the passage of Proposition I, they had both the incentive and the opportunity to develop their case after that point. On November 15, 1979, 9 days after the passage of the Proposition, the Board sought relief from the court's earlier orders requiring mandatory pupil reassignment and transportation. The Board posed the issues of the effect of the original findings and conclusions and of "[w]hat additional proceedings must occur before this Court can determine whether a violation of the Equal Protection Clause has occurred." The Board ended its argument with a statement

---

12. For cases since *Slater* finding the rule inapplicable, *see, e.g., Fehlhaber v. Fehlhaber,* 702 F.2d 81 (5th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983); *Stuart v. Real* *Estate,* 148 Cal.App.3d 1, 195 Cal.Rptr. 524 (1983); *Fellers v. Fellers,* 125 Cal.App.3d 254, 178 Cal.Rptr. 35 (1981).

that it wanted a hearing on the de jure issue.

Again on December 4, 1979, the Board stated that new evidence should be taken regarding violations of federal law if the court decided to reject the Board's all-voluntary plan. Plaintiffs responded on December 19, 1979, relying on the arguments that the 1970 findings were res judicata of de jure segregation, and that Proposition I was unconstitutional retroactive legislation that deprived plaintiffs of their vested rights in the prior judgment. Plaintiffs contended that, until the constitutionality of Proposition I was established, there was no need to discuss the contention that the 1970 findings did not establish a federal constitutional violation. If it became necessary to discuss the Board's contention after that, then plaintiffs would "ask leave of Court for the opportunity to so do."

The trial court then ruled that federal constitutional violations had already been established, but the Court of Appeal reversed in *Crawford II*. We will discuss the exact scope of that decision in a moment. But at the least it held that the 1970 findings did not establish de jure segregation in violation of the Fourteenth Amendment. If that decision was erroneous, the remedy was appeal. The plaintiffs sought review in the Supreme Court of California, which denied review. In opposing review by that Court, the Board argued that the case was in a posture where the trial court could "conduct a hearing on the existence of any 14th Amendment violation and its segregative effects" and could issue an order that would subsequently present the case for complete appellate review.

Upon being denied a hearing by the Supreme Court of California, the *Crawford* plaintiffs petitioned for certiorari in the Supreme Court of the United States, but only as to the ruling of the Court of Appeal that Proposition I was constitutional. The Supreme Court granted review and upheld Proposition I. *Crawford v. Board of Education*, 458 U.S. at 527, 102 S.Ct. at 3211.

Meanwhile, the remittitur of the Court of Appeal had been filed on March 12, 1981, one day after the Supreme Court of California denied review. The remittitur recited from the *Crawford II* judgment of December 19, 1980: "[T]he matter is remanded to the trial court for further proceedings consistent with this opinion. It is not our intent to disrupt the operation of the schools during the present semester. Since our decision will not become final for thirty days, the parties have ample time to take whatever legal action they think desirable prior to the commencement of the next school semester."

As we read the opinion in *Crawford II* and the remittitur, they did not foreclose plaintiffs from reopening and further litigating the issue of de jure segregation framed by the pleadings. The remittitur itself refers to additional legal action by the parties. It also requires, however, further "proceedings consistent with" the opinion in *Crawford II*. Certainly the opinion contains no express direction limiting the nature of proceedings on remand. The question, then, is whether the opinion establishes law of the case that would be inconsistent with a reopening of the de jure issue on remand. *See Puritan Leasing Co. v. Superior Court*, 76 Cal.App.3d 140, 147–48, 142 Cal.Rptr. 676, 680 (1977); 6 Witkin, *supra*, Appeal § 556. We think that when the opinion is fairly read as a whole, it does not do so. It is true that at one point the Court of Appeal concludes, in a manner that would appear to preclude further litigation of the issue, that the racial imbalance in the Los Angeles schools that was the subject of Judge Gitelson's 1970 findings was not de jure in origin.[13] But we do not read this comment as a conclusion that plaintiffs could not produce

---

13. "From the foregoing recital of the cause and of the United States Supreme Court desegregation decisions we conclude that the racial imbalance and segregation which existed in many schools in the District and the Board's actions in relation thereto did not constitute a violation of the Fourteenth Amendment as interpreted by the United States Supreme Court in that racial imbalance and segregation did not result from Board acts performed with segregative intent and discriminatory purpose." *Crawford II*, 113 Cal.App.3d at 650, 170 Cal.Rptr. at 506.

evidence that the segregation was de jure; it is only a conclusion that they had not yet done so. The rest of the opinion supports our interpretation. The court merely reviewed the trial court's findings and held that as a matter of law they did not support the trial judge's conclusion of de jure segregation as that term was defined by the most recent Supreme Court decisions.[14] Merely because the appellate court found the evidence at the original trial insufficient to support the judgment does not generally foreclose retrial on remand.[15] *See* 6 Witkin, *supra,* Appeal § 548. Moreover, if the trial court had any doubt as to the nature of the appellate court's directions, it had to resolve it in favor of granting the plaintiffs a retrial. *Id.* at § 552; *see also Puritan Leasing,* 76 Cal. App.3d at 148, 141 Cal.Rptr. at 680.

■ We conclude, therefore, that the decision and remittitur in *Crawford II* did not foreclose further litigation of the issue of de jure segregation in the trial court. Plaintiffs here have not seriously contended otherwise. Indeed, in the district court they argued that the *Crawford* decision was not final because the remand left the door to further litigation open, a contention that was accepted by the district court. Moreover, the behavior of the *Crawford* plaintiffs throughout the period following remand, and the behavior of the Board until virtually the closing moment of the litigation, reflected an understanding that the de jure issue was still subject to reopening.

After the remittitur, the defendant Board adopted a resolution ending all mandatory aspects of its previous desegregation plan. Plaintiffs moved the state court on March 26, 1981, to enjoin implementa-

tion of that resolution on the ground that it was an affirmative act of intentional segregation in violation of the mandates of *Crawford I* and *II* and of orders of the trial court.

On March 31, 1981, the Board filed a memorandum noting the issues remaining for decision after remittitur. It stated that the Board was advised by plaintiffs that plaintiffs wished to initiate proceedings in the trial court to establish that the District had engaged in acts of de jure segregation in violation of the Fourteenth Amendment.

On April 8, 1981, the trial court held a hearing on plaintiffs' motion for an injunction against implementation of the Board's resolution of March 16, 1981, ending mandatory desegregation measures. The motion was denied, and plaintiffs appealed to the Court of Appeal.

On April 15, 1981, while that state appeal was pending, plaintiffs filed the present action in federal district court. Plaintiffs sought and obtained a temporary restraining order from the district court restraining the District from implementing its March 16, 1981 resolution. In arguing in favor of the TRO, plaintiffs asked the district court to take judicial notice of the 1970 *Crawford* state court findings of de jure segregation, contending that those findings left little doubt that plaintiffs would succeed on the merits of their federal de jure claim.

■ At this point the posture of the two sets of plaintiffs, who are identical for purposes of res judicata, was that they were litigating the constitutionality, in light of the 1970 findings, of the Board's modification of its desegregation plan—the Board's resolution of March 16, 1981—in

---

**14.** "In sum, no federal violation of law was established by the 1970 findings, and the trial court's identification of the then existing racial segregation within the Los Angeles school system as de jure segregation was true only in a Pickwickian sense, and was not true at all in the sense of federal law. Because there was no evidence of acts done with specific segregative intent and discriminatory purpose, there was no federal constitutional violation—regardless of the terminology of the court." *Crawford II,* 113

Cal.App.3d at 647, 170 Cal.Rptr. at 504. *See generally id.* at 645–47, 170 Cal.Rptr. at 503–04.

**15.** Such a finding does have some significance, however. If, for example, there were a retrial and the evidence at the retrial was substantially the same as that at the original trial, the former decision would be the law of the case. *Stromer v. Browning,* 268 Cal.App.2d 513, 521, 74 Cal. Rptr. 155, 160 (1968).

both state and federal court. There is no rule that prohibits them from doing so. There is a rule, however, that when one of the two courts enters a judgment that becomes final, it will have a preclusive effect on the other proceeding. *See Ruben v. City of Los Angeles*, 51 Cal.2d 857, 861 n. 1, 337 P.2d 825, 827 n. 1 (1959). Plaintiffs should not be surprised to have that rule invoked here.

This court subsequently vacated the TRO granted by the district court. *Los Angeles Unified School District v. United States District Court*, 650 F.2d 1004 (1981). Proceedings then continued in state court. On May 4, 1981, the Crawford plaintiffs filed a statement of issues that referred to the de jure issue only in a footnote:

> Petitioners believe that an appropriate plan can and should be ordered under the existing mandate and provisions of the United States and California Constitutions. Should courts hold otherwise, a hearing in this court to prove de jure liability may become necessary.

That hearing was never requested. In subsequent proceedings the plaintiffs urged the court to implement its own desegregation plan using nonvoluntary approaches of pairing, clustering, adjusting feeder patterns and reorganizing grades. The court adopted the Board's plan, however, with minor changes. Ultimately all appeals were abandoned and the order of September 10, 1981, terminating the case on the merits became final.

On May 4, 1981, the same day that the plaintiffs had filed their last footnote mention of the possibility of requesting a hearing to prove de jure liability, the Board submitted a memorandum which for the first time took the position that the mandate of *Crawford II* precluded such a hearing. Obviously, that does not appear to have been the position of the plaintiffs, just as it had previously not been the position of the Board. The plaintiffs nevertheless let the matter of reopening the original de jure case drop. In addressing the issue of the relief to which they were entitled, plaintiffs had vigorously and fully litigated the issue of whether Proposition I was itself an act of de jure segregation. In further pursuing their relief after the remittitur in *Crawford II*, they had vigorously litigated the question whether the Board's resolution of March 16, 1981, abandoning mandatory desegregation measures was an act of de jure segregation. Yet they never attempted to reopen their original de jure claim despite the Board's repeated earlier suggestions and their own stated awareness of the possibility.

Plaintiffs may have foregone their opportunity in *Crawford* because they hoped to accomplish their goals by urging other desegregation approaches on the state court. Or they may have chosen to pursue their original de jure claim in a federal forum that they perceived as being more receptive. The record contains some support for either surmise, but it makes no difference. The de jure issue was originally litigated; it could have been reopened in a later stage of the proceedings when the incentive to pursue it was greater. Plaintiffs cannot simply move to federal court and start anew. *See Allen v. McCurry*, 449 U.S. 90, 104–05, 101 S.Ct. 411, 420–21, 66 L.Ed.2d 308 (1980).

There is no manifest injustice in denying plaintiffs the opportunity to relitigate a part of a claim when they had a previous opportunity to do so but elected against it. *Stuart v. Real Estate*, 148 Cal.App.3d 1, 195 Cal.Rptr. 524, 526 (1983). The opportunities plaintiffs were afforded in the state proceedings both before and after the passage of Proposition I amply satisfy the requirements of due process. There is accordingly no constitutional barrier to our giving full faith and credit to the *Crawford* judgment. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480–82, 102 S.Ct. 1883, 1896–98, 72 L.Ed.2d 262 (1982). Nor, finally, has there been any change in the basic federal law of de jure segregation that would justify re-

laxation of the rule of claim preclusion. *See Bronson v. Board of Education,* 687 F.2d 836, 841 (6th Cir.1982). There most certainly has been no change since *Crawford* closed.[16]

IV

CONCLUSION

The order of the district court denying claim preclusive effect to the *Crawford* judgment is REVERSED.[17] The case is REMANDED to the district court for further proceedings consistent with this opinion.

BROWNING, PREGERSON, NELSON, BOOCHEVER and NORRIS, Circuit Judges, concur.

SNEED, Circuit Judge, concurring in part and dissenting in part; Choy, Wallace and J. Blaine Anderson, Circuit Judges, joining.

I concur with the majority that the doctrine of *res judicata* bars relitigation in this action of any claim that the Los Angeles School Board committed acts of *de jure* segregation prior to the conclusion of the state court trial in 1969.

However, I dissent in part because I believe that the preclusive effect of *res judicata* is greater. It also extends to alleged segregative acts that occurred after the original trial but prior to the entry of the state court's final order in 1981.

My position rests on the proposition that the amendment of the California Constitution by Proposition I explicitly put all alleged segregative acts at issue in the state court proceedings. The state court, as a result of the *Crawford* plaintiffs' lawsuit, had responsibility for supervising the implementation of a desegregation plan for the Los Angeles schools. The *Crawford*

plaintiffs, for their part, were required to bring before that court any allegations, such as post-1969 segregative acts, that would have affected the scope of that plan. Having kept their silence in the state court, representatives of the same class are not free to bring in federal court an action, based on allegations that could have been, but were not, raised in the state court, to set aside the plan approved by the state court and to order development of a new one.

In support of this conclusion, it should be recalled that in 1976, on appeal of an action brought by the plaintiff class, the Supreme Court of California charged the Superior Court of Los Angeles County with the responsibility to "exercise broad equitable powers in supervising the preparation and implementation of a reasonably feasible desegregation plan" for the Los Angeles school system. *Crawford v. Board of Education,* 17 Cal.3d 280, 308, 130 Cal.Rptr. 724, 743, 551 P.2d 28, 47 (1976). The Superior Court, with the active participation of the *Crawford* plaintiffs, was still engaged in executing that responsibility when the California Constitution was amended by Proposition I in 1979. The amendment, in combination with decisions of the United States Supreme Court, had the effect of conditioning certain of the equitable powers of the court—namely, the power to order reassignment and/or transportation of students—on a finding of *de jure* segregation.

The majority acknowledges that the plaintiffs did, in the Superior Court proceedings in 1979 and 1981, have a full and fair opportunity, as well as ample incentive, to allege and prove acts of *de jure* segregation, done at *any* time in the past, that would have justified a busing order. But the majority, nonetheless, concludes that the *Crawford* plaintiffs were under a duty to take advantage of that opportunity only

---

**16.** Under California law a change in the law following the original judgment is not a ground justifying relief from the doctrine of res judicata. *Slater v. Blackwood,* 15 Cal.3d at 796, 126 Cal.Rptr. at 227, 543 P.2d at 595.

**17.** Because we conclude that plaintiffs are barred by the claim preclusive effects of the *Crawford* judgment, we do not reach any issues of collateral estoppel (issue preclusion).

with respect to segregative acts that occurred prior to the close of the original trial in 1969. I strongly disagree. The majority's application of the doctrine of *res judicata* ignores both the realities of this case and the unique nature of school desegregation actions.

In this case, as well as in school desegregation cases generally, there is only one right at issue: the right of the plaintiffs to a desegregated school system.[1] In this case, the decree of the Superior Court, entered on September 10, 1981, was designed to vindicate that right. It was not designed merely to nullify, or to compensate for, particular acts of segregation that occurred prior to the 1969 trial. Nor was it designed to remedy the segregated condition of the Los Angeles school system as it existed at the close of trial in 1969. Rather, it incorporated those steps deemed necessary, in light of *the conditions that existed at the time the decree was entered,* to achieve desegregation of the school system. It was addressed to *"present conditions." Crawford v. Board of Education,* No. 822 854, Order Re Final Approval of School Board Desegregation Plan and Discharge of Writ of Mandate at 7 (Super.Ct. L.A. County, Sept. 10, 1981) (emphasis in original).

Acts of *de jure* segregation by the Los Angeles School Board between 1969 and 1981, were such to exist, would not create new and distinct rights. Any decree addressed thereto would serve the same function as did the Superior Court's order, namely, the *contemporary* desegregation of the Los Angeles school system. Any such acts would, however, expand the range of equitable powers that the Superior Court could invoke in fashioning its decree. Presumably the plaintiffs would have desired the invocation of those powers. Between 1969 and 1981 they had the opportunity and incentive to allege any *de jure* segregative acts of that period that would have made the additional remedies available. It is unreasonable to permit the

plaintiffs to bring their allegations of *de jure* segregation since 1969 in another action in another court rather than presenting them to the Superior Court.

The majority's limitation of the *res judicata* effect of the state court action relies on the formal rule that "[t]he scope of the litigation is framed by the complaint at the time it is filed." This rule is quite suitable when applied to ordinary tort or contract cases. But even the majority does not strictly apply the rule to this case. Were it so applied, the *res judicata* effect of the state court action would extend only to segregative acts that occurred before 1963. Quite correctly, the majority rejects such a narrow approach. Instead, the majority construes a stipulation between the parties as a supplemental pleading that extended the scope of the litigation through the time of trial. The majority's problem is that it failed to follow through with this sound approach. The California Constitution requires that the "Application for Modification of Orders," filed by the school board following the passage of Proposition I in 1979, be construed as a supplemental pleading that put at issue the question of whether any acts of *de jure* segregation occurred up until the final disposition of that motion. The California Constitution, as amended by Proposition I, provides that, upon such an application, any desegregation order, *"whenever rendered, ... shall ...* be modified to conform to the provisions of [Proposition I], *as applied to the facts which exist at the time of such modification."* Cal. Const. art. 1, § 7(a) (emphasis added).

The board's motion reflected the terms of Proposition I. It asked the court to determine "[w]hether this Court, *applying the facts as they exist today,* could properly determine that the Board had violated the Equal Protection Clause of the 14th Amendment." *Crawford v. Board of Education,* No. 822 854, Application for Modification of Orders at 3–4 (Super.Ct. L.A. County, Nov. 15, 1979) (emphasis added).

---

1. The majority rests its conclusion on the proposition that the doctrine of *res judicata* does not apply to "new rights acquired pending the action."

The Application asked the court to "hold a hearing to determine whether a federal court, *sitting today,* would find a *de jure* violation and impose a remedy involving pupil school assignment or pupil transportation." *Id.* at 4 (emphasis added).

The board's application and its request for a hearing was clearly an invitation for the plaintiffs to come forward with whatever evidence existed of *de jure* segregation in the decade since the original trial. The invitation was declined. The board's interest in settling the issue once and for all, so that it could proceed to implement a desegregation plan that satisfied all constitutional requirements, state and federal, should not be permitted to be frustrated by the plaintiffs' unilateral decision.

To permit, as would the majority, another action in another court alleging acts of segregation between 1969 and 1981 that could have been, but were not, alleged in the state court action, would seriously undermine the efforts of the state court, the school board, and all the participants in the state court proceedings, to find a stable and lasting solution to the problem of racial segregation in the Los Angeles school system. The school board has a right to expect that when, after eighteen years of litigation and struggle, the state court approves its desegregation plan and declares that the plan meets state and federal constitutional standards, that plan will not have to be immediately scrapped and a new one formulated as the result of a new lawsuit alleging acts that the plaintiffs could have alleged, but chose not to, in the state court proceedings. Similarly, the students, parents, and teachers of the school system have a right to some stability and continuity in the schools. As Judge Lopez stated in his final order approving the board's desegregation plan, "A case that involves the education of children must be resolved. There must be finality in the law so that people may plan their everyday lives to conform to the requirements of the law." *Crawford,* Order re Final Approval, *supra* at 2. School district resources at this time should be spent on education—and on integration—rather than on continuing litigation and relitigation.

The Superior Court's final judgment in no way insulates the school board from litigation over actions that it may have taken after the entry of that judgment or that it may take in the future. But the principle of *res judicata,* coupled with a realistic and practical approach to the unique problems of school desegregation cases, requires that the final approval of the board's desegregation plan bring an end to litigation over events that occurred prior to that approval.

These conclusions are consistent with California law, which, I acknowledge, governs the preclusive effect of the 1981 judgment. *See Migra v. Warren City School District Board of Education,* —— U.S. ——, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). That law is properly reflected in *Eichman v. Fotomat Corp.,* 147 Cal. App.3d 1170, 197 Cal.Rptr. 612 (Ct.App. 1983). In *Eichman,* the plaintiff complained of injuries arising from a continuing relationship that was not terminated by the filing of the lawsuit. Following a judgment entered as the result of a settlement, a second suit was brought seeking additional relief with respect to alleged wrongs occurring before the judgment. The court held that "the judgment entered in the Eichmans' first suit bars any future recovery for acts committed by Fotomat before judgment was entered, but should Fotomat commit new wrongs, new suits may be brought." 147 Cal.App.3d at 1177, 197 Cal. Rptr. at 615. It recognized that a continuing wrong was terminated for purposes of claim preclusion only by judgment, not by the filing of the suit. Only after judgment did a new cause representing a distinct primary right come into being. *Accord Lord v. Garland,* 27 Cal.2d 840, 849, 168 P.2d 5, 11 (1946). Because of both the unique character of school desegregation cases in general and the special circumstances of this case, the date of judgment, for the purpose of applying the *Eichman* rule, must be the date of the state court's final order in 1981.

*Kettelle v. Kettelle,* 110 Cal.App. 310, 294 P. 453 (1930) is not to the contrary. It merely held that a tentative awarding of custody of a child to one parent in a suit for divorce did not preclude a second suit to determine the fitness of that parent to retain custody based on acts committed during the divorce trial. The court treated the custody issue raised by the second suit as a new right procedurally unrelated to the matter of divorce. *Id.* at 312, 294 P. at 454. The juridical relationship between the alleged pre- and post-1969 *de jure* segregative acts in this case, however, is plain and was never seriously questioned until now. These acts, had they been established, would have constituted but manifestations of a continuing wrong, the correction of which would have been possible up to the date of final judgment in 1981. To deny this at this late date serves only to attempt to breathe life into a case more resembling at this time a desiccated corpse than a new born babe. The attempt is unnecessary, unwise, and misguided. I respectfully dissent.

PREGERSON, Circuit Judge, concurring; NELSON, Circuit Judge, joining:

I wholeheartedly concur with both the reasoning and result of Judge Canby's scholarly opinion and add these observations.

The court's opinion is an important milestone in the long struggle to achieve equality for the schoolchildren of Los Angeles.

Our decision gives plaintiffs the opportunity to prove that, after May 2, 1969, the school district intentionally discriminated against black pupils. Of course, the decision does not permit plaintiffs to establish that de jure segregation existed before this date. But nothing in our opinion prevents them from offering, for the purpose of shedding light on the school district's intent after May 2, 1969, evidence of de jure acts that occurred before then.

Fifteen years ago, Los Angeles Superior Court Judge Alfred Gitelson rendered his courageous decision finding that Los Angeles maintained a segregated school system. Six years ago, Los Angeles Superior Court Judge Paul Egly dedicated the remainder of his judicial career to fashioning a just and workable remedy. Somehow, their efforts were thwarted. But today, we have opened the doors to a United States Courthouse and made it possible for a federal district judge to address the vital social issues this case presents.

POOLE, Circuit Judge, concurring in part, dissenting in part.

I agree with the majority that the plaintiff "class" members cannot be barred by the doctrines of res judicata or issue preclusion from litigating the *de jure* issues of this case for the period following May 2, 1969. It is beyond dispute that both sides formally stipulated at the beginning of trial that they were going to try issues covering the period 1963 to 1968.

I disagree with the conclusion that in the aftermath of *Crawford v. Board of Education,* 113 Cal.App.3d 633, 643, 170 Cal.Rptr. 495 (1980), (*Crawford II*), the plaintiffs ever had that "full and fair opportunity" to relitigate their pre-1969 *de jure* claims as the majority charges. The time constraints and the unique circumstances of the last years of this case made quite illusory the possibility of any reopening in view of *Crawford II's* mandate pursuant to its heavy-handed treatment of the facts and principles believed long since established about the unacceptability of racial school segregation in California and about the State's consequent duty to bring it to an end.

Nor can I share the buoyant confidence expressed by some of my colleagues that today's decision promises any certainty of success in moving the bureaucracy of Los Angeles' school systems to repair the damage after years of neglect and indifference to the rights of all children to equal education. Still less do I anticipate that the mentality which put Proposition I on the

lawbooks of this state has any real interest in making the accommodations needed to bring about the goal of quality education for all.

Therefore, with appreciation of the majority's conscientious efforts, I am moved toward this separate writing, for I do not see this as just another "school case." Rather, we may be at a watershed in public and political perception of the constitutional principles of equal protection, and what happens to this case may furnish indicators of how fragile is the ground on which such principles rest.

*Historical Observations*

Some review of things past seems relevant to give appropriate context. In the century after the founding of California, and until the courts, federal and state, imposed constitutional restraints, there existed in this state attitudes, policies and practices of denying equal protection to certain citizens, of limiting freedom of mobility within the social community, of curtailing their legal and property rights, and of imposing differential treatment on account of race, color, and origin.

Before the turn of the century, when the railroads brought in large numbers of Chinese as laborers, they were traditionally and for many years restricted to living in the ghetto areas which became the Chinatowns of the west. When Japanese people began to arrive in large numbers at century's end, agitation developed throughout the western states to withhold agricultural lands from them because of the "competition" feared from their labor and industry. *See* McGovney, *The Anti-Japanese Land Laws of California and Ten Other States,* 35 Cal.L.Rev. 7, 14 (1945). In 1913, by legislation, and more strictly in 1920, by the Initiative Process, California adopted the Alien Land Law (Alien Property Initiative Act of 1920, Stats.1921, p. lxxxiii, as amended; 1 Deering's Gen.Laws, Act 261), which forbade aliens, most particularly Asians, from owning real property, or from leasing it for more than three years. The courts of California upheld this law and enforced it by injunctions and forfeiture proceedings until the Supreme Court held that the legislation violated the Equal Protection Clause of the United States Constitution. *Oyama v. California,* 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948).

The good people of California brought to state-of-art usage the device of racially restrictive covenants, which forbade altogether the ownership, and even its occupancy (except for servants), of residential property by "any person not of the Caucasian race." California courts, at all levels, had a long history of upholding and vigorously enforcing these agreements by injunctions and suits for damages. The real estate industry exploited the exclusivity of existing covenants to boost sales and encouraged the filing of new restrictions. In practical and wide effect desirable residential areas became virtually unavailable, with some exceptions, to nonwhites, because of the breadth of coverage of the covenants which generally provided that

> neither said premises, nor any part thereof, shall be used in any manner whatever or occupied by any Negro, Chinese, Japanese, Hindu, Armenian, Asiatic, or native of the Turkish empire, or descendant of the above named persons, provided, however, that such a person may be employed by a resident upon said property as a servant for such resident.

McGovney, *Racial Residential Segregation by State Court Enforcement of Restrictive Agreements, Covenants or Conditions in Deeds is Unconstitutional,* 33 Cal.L.Rev. 5, 15 (1945).

Not only were nonwhite persons barred from desirable areas by the existence of covenants, but even where no restrictions actually ran with the land, local boards of realtors, by custom and practice, and by so-called "codes of ethics," bound themselves not to show or sell properties in "white" neighborhoods to nonwhites. Thus were created barriers restricting where people could live, enjoy their lives, and raise their families. In large measure, this is how racial minorities came to be where they were when this case was filed.

In the same year the Supreme Court decided the *Oyama* case, it also decided in *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), that when the California courts enforced racial restrictive covenants by way of injunction, that amounted to "state action" by California, and that such enforcement violated the equal protection clause of the Fourteenth Amendment. Next, in *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the Court for the same reason held that state courts could not allow covenantors to sue for damages for breaches of those agreements. However, by then, many residential patterns had already been fixed and the exclusion of nonwhites from residential areas was widespread and very effective.

In the intervening years, in Los Angeles and elsewhere generations of children had been assigned to schools in neighborhoods whose locations and constituent populations were shaped and maintained by discriminatory residential housing practices. Nor was this merely the accident of place and preference, for many forces combined to create segregation: state and city authorities, school boards, legislatures, businesses and public and private institutions all had some hand in the perpetuation of housing patterns. Consequently, this also affected school patterns, and the complexion of the public schools. Decisions about where schools would be built or maintained, the direction and sources of feeder patterns, the configuration of district boundaries, the planning of public transportation, and, above all, the public attitude about the role of schools in the neighborhoods, set in motion currents which ebbed and flowed, became eventually the focus of public debate, and then the subject of litigation.

### Pre-Crawford Litigation

Progenitor to all modern school segregation cases is *Brown v. Board of Education of Topeka, Shawnee County, Kansas, et al.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*"Brown I"*). There Chief Justice Earl Warren and the Court discarded the "separate but equal" rationale of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), a doctrine which had for generations furnished justification for racial segregation in public facilities. The Court made a very simple statement. It said:

> We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment.

*Brown I*, 347 U.S. at 495, 74 S.Ct. at 692.

The Court invited submissions from the parties as to the form of relief to implement "the fundamental principle that racial discrimination in public education is unconstitutional." *Id.* at 495–496, 74 S.Ct. at 692–693. A year later, May 31, 1955, having considered the complex judicial administration concerns implicit in its decision, the Court issued a final order:

> the cases are remanded to the District Courts to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis *with all deliberate speed* the parties to these cases. (Emphasis supplied.)

*Brown v. Board of Education of Topeka, Kansas*, 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955) (*"Brown II"*) (emphasis supplied).

The performance did not match the mandate. Litigation did not bring solution. Litigation continued.

*Jackson v. Pasadena City School District*, 59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878 (1963)

Prior to 1961, the City of Pasadena in Los Angeles County contained several junior high school zones, Washington, McKinley, and Eliot, into which various elementary school districts served as feeders. Lin-

da Vista elementary school district had formerly fed into a fourth junior high school zone which withdrew from the Pasadena district. It then became necessary to determine where the Linda Vista pupils, all of them white, would be sent. Some parents feared their children might be required to attend Washington, whose enrollment was predominantly of Negroes and members of other minority groups. The parents threatened to seek withdrawal from the Pasadena district were this done. Although Washington was geographically nearer, the school board adopted new boundaries putting Linda Vista in the McKinley zone. The boundary changes permitted most white pupils to avoid attending schools with a high proportion of Negroes, while relegating Negro pupils to a single school.

Jackson, a black student, requested leave to transfer to the Eliot zone which was more convenient to his home than Washington. When his request was denied, he sued. The board's demurrer was sustained. The California Supreme Court reversed. Chief Justice Gibson said for his unanimous court:

> The boundaries of school zones are normally fixed on a neighborhood basis, and where racial imbalance exists in California schools it is usually caused by the fact that the Negro population tends to concentrate in certain areas due to economic factors and discrimination in housing. * * * A racial imbalance may be created or intensified in a particular school not only by requiring Negroes to attend but also by providing different schools for white students, who, because of proximity or convenience, would be required to attend it if boundaries were fixed on a nonracial basis.

*Jackson*, 59 Cal.2d at 881, 31 Cal.Rptr. at 609, 382 P.2d at 881. The court laid down a guiding principle concerning the duty and obligation of boards of education in California.

> So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause antisocial attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause.

*Id.*, 59 Cal.2d at 881, 31 Cal.Rptr. at 609–610, 382 P.2d at 881–882. This principle stood as the law until 1979 when the voters opted, by Proposition I, to make it hard to undo the effects of decades of institutionalized discrimination.

### The Crawford Litigation

It is of historical fact that the Supreme Court's charge in the two *Brown* cases, that there be "all deliberate speed" in the elimination of segregated schools, has always encountered strong resistance. So also did Chief Justice Gibson's ringing declaration in *Jackson* meet with stubborn opposition in California. In 1963, shortly after *Jackson* was decided, the *Crawford* suit was filed in Superior Court against the Los Angeles Unified School District to compel its board to prepare and implement a master plan for the eventual desegregation of the district. The course of that effort has been well chronicled in Judge Canby's majority opinion and I shall not repeat it here. It is enough for this purpose that valiant efforts were made to persuade the District to do voluntarily what the United States Supreme Court and the California Supreme Court had held was its bounden duty.

When persuasion failed, even though the litigation was several times recessed to pursue settlement, trial commenced in October 1968. After some 65 court days, it

concluded in May 1969 in a judgment in favor of the plaintiffs. The court issued a writ of mandate to compel the District to submit and to implement a "meaningful desegregation plan" which would "realistically work within a reasonable period of time, having for its aim, purpose and object a racially nondiscriminatory unitary school system * * *." The District appealed. The California Court of Appeal, Second District, reversed, rejecting Judge Gitelson's findings of the existence of systemic and systematic policies of racial segregation. *Crawford v. Board of Education of the City of Los Angeles*, 120 Cal.Rptr. 334, *vacated*, 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976). The California Supreme Court granted hearing.

In *Crawford v. Board of Education of the City of Los Angeles*, 17 Cal.3d 280, 130 Cal.Rptr. 724, 551 P.2d 28 (1976), the Supreme Court vacated the intermediate appellate court's judgment of reversal. It affirmed the trial court's judgment issuing the writ of mandate. The opinion reviewed the Superior Court's detailed findings, including the finding that the board

> "has * * * since at least May of 1963, knowingly, affirmatively and in bad faith * * * by and through its affirmative policies * * * and practices, * * * segregated, *de jure*, its students. * * * "

Justice Tobriner then further held:

> The [trial] court based this finding on a number of affirmative actions which the board had taken over the relevant period with the knowledge that such acts would create and perpetuate segregated education within their district.

*Id.*, 17 Cal.3d at 288, 130 Cal.Rptr. at 728, 551 P.2d at 32. In my judgment this is an important decision upholding the trial judge's finding of fact. Its significance appears later.

In sustaining the finding that segregation of the Los Angeles School District was *de jure* in nature, the court found it unnecessary to place its specific imprimatur on a resolution of the *de jure/de facto* terminology. It had already held 13 years previously in *Jackson* that affixing such a label

was unnecessary, since under any appellation, the evil was the same and had to be exorcised. But, because four years later in *Crawford II* (1980) the same intermediate appellate court whose reversal of Judge Gitelson's decision was itself reversed and vacated, rewrote history and denied that the *de jure* finding was valid, I set forth here Justice Tobriner's exact language in *Crawford I:*

> The defendant school board appeals from the trial court judgment, contending primarily that the segregated condition of its district's schools should properly be characterized as "de facto" rather than "de jure" and that it owes no constitutional duty to alleviate such de facto school segregation. *The findings in this case adequately support the trial court's conclusion that the segregation in the defendant school district is de jure in nature.* We shall explain, however, that we do not rest our decision on this characterization because we continue to adhere to our conclusion in *Jackson* that school boards in California bear a constitutional obligation to take reasonably feasible steps to alleviate school segregation "regardless of its cause." (59 Cal.2d at p. 881, 31 Cal.Rptr. 606, 382 P.2d 878). Consequently, the trial court's finding that the schools in the Los Angeles Unified School District are segregated, together with its conclusion that the defendant school board has failed to undertake reasonably feasible steps to desegregate its schools, are sufficient to sustain the trial court's order compelling the school board to prepare and implement a plan which attempts to alleviate the segregation and the traditional harmful effects of segregation in its district's schools.

17 Cal.3d at 285, 130 Cal.Rptr. at 726, 551 P.2d at 30 (emphasis added). Later the opinion detailed references to the bases on which the trial court had reached that conclusion.

### *Crawford II*

As the majority opinion sets forth, following the affirmance by the California

Supreme Court, in *Crawford I*, the case was remanded to the Superior Court for further proceedings.

The following is a chronology of subsequent proceedings:

*October 3, 1977*, the Board submitted its Plan II. The Plan involved pairing and clustering of some minority and white schools in grades four to eight, only, including mandatory re-assignment of some students.

*September 12, 1978*, Plan II went into effect for the school years 1978–79. Trial to determine the sufficiency of the Plan was set for June 4, 1979, and then continued to October, 1979.

*October 17, 1979*, Board asked leave to withdraw all mandatory aspects of Plan II, and to substitute an all-voluntary plan.

*October 22, 1979*, trial began on sufficiency of Plan II and of the proposed all-voluntary plan.

*November 6, 1979*, Proposition I was approved, amending California Constitution's Due Process and Equal Protection provisions, and providing that

[N]othing * * * [in the California Constitution] imposes upon [the State, any official public entity, or board], any obligations or responsibilities which exceed those imposed by the Equal Protection Clause of the Fourteenth Amendment * * * with respect to the use of pupil school assignment or pupil transportation. * * * [N]o court of this state may [require] pupil school assignment or pupil transportation, (1) except to remedy a specific violation that would also [violate the Fourteenth Amendment], and (2) unless a federal court * * * would be permitted * * * to [require such remedy under the Fourteenth Amendment].

*November 15, 1979*, the Board applied for modification of the court's orders of May 7, 1978, and May 30, 1979, which had required mandatory reassignment. The Board argued that there had been no *de jure* violations under federal law, that Judge Gitelson's findings to that effect did not support such a conclusion, and that they were not res judicata or law of the case. There is no transcript of the argument. Both sides submitted briefs. In their Memorandum of Law, plaintiffs argued that there had indeed been findings of *de jure* segregation, which findings were final; that res judicata applied; and that the Board had not established that Proposition I was constitutional.

*January 21, 1980*, the Board filed a memorandum about the constitutionality of Proposition I. It argued that the trial court's finding of *de jure* segregation was dictum, hence not necessary to the judgment, and not res judicata.

*April 23, 1980*, plaintiffs filed replies. They argued that the *de jure* issues had been pleaded, argued, and decided in their favor.

*May 19, 1980*, Judge Egly denied the application for modification. He held that Judge Gitelson's 1970 finding was that the segregation was *de jure.* Hence he found it unnecessary to consider Proposition I because "the mandate here requires the same result as would be required under Federal decisional law."

*July 7, 1980*, Judge Egly filed findings of fact and conclusions of law. He ordered the Board to adopt a plan devised by the court providing for mandatory pairing and clustering of 144 elementary and 9 junior high schools, for magnet schools, for mandatory transportation and reassignment.

*July 10, 1980*, the Board appealed the orders of May 19 and July 7, 1980.

*December 19, 1980*, the California Court of Appeal filed its decision vacating Judge Egly's orders of May 19, 1980 and July 7, 1980. *Crawford v. Board of Education of the City of Los Angeles*, 113 Cal.App.3d 633, 170 Cal.Rptr. 495 (1980) (*Crawford II*).

*Full and Fair Opportunity for Relitigating the Issues of De Jure Segregation*

I am convinced that when *Crawford II* is read closely along with its mandate and with the subsequent history of this case there was no full and fair opportunity real-

istically open to the plaintiffs to reinstate litigation of the *de jure* issues.

The California Court of Appeal went about the appeal before it with the obvious determination to get rid of the busing program ordered by the Superior Court and to uphold Proposition I. That court had tried to reverse Judge Gitelson's orders when the case was first before it in 1975. Indeed, it had in fact rendered an opinion reversing the judgment (120 Cal.Rptr. 334), which the California Supreme Court unanimously vacated. In 1980 the Court of Appeal got a second chance. The *Crawford II* opinion rejected or found insignificant the factual findings made by the trial court. It disputed the materiality of the trial evidence that the Board had manipulated neighborhood schools, attendance areas, and boundaries, so as not only to impact existing segregation of schools, but to increase and worsen that impact; that it had adopted transfer and transportation policies which it knew could not cope with the immensity of the problems and the distances involved in the administration of the Los Angeles School District; that in respect of the allocation or withholding of funds, the selection of plant sites, assignment of teachers, and in dealing with such things as curriculum imbalances, the Board had, in the trial court's opinion of the facts, pursued conduct which a qualified educator must surely have known would discriminatorily impact against racial minorities. *See Crawford II*, 113 Cal.App.3d 642–643, 170 Cal.Rptr. at 501–502.

The trial court found that the patterns of the Board's conduct were not random or neutral, but were executed with a design to keep things as they were. The appellate court seized upon the absence of a discrete finding that there existed "a policy or program which denied admission to any school or required attendance at any school on the basis of race," or an articulated "gerrymandering of attendance zones to create or preserve segregated schools." *Id.* at 644, 170 Cal.Rptr. at 502. It concluded that *de jure* segregation existed "only in a Pickwickian sense, and was not true at all in

the sense of federal law." *Id.* at 646, 170 Cal.Rptr. at 504.

Nowhere did the appellate court consider the Supreme Court's language in *Crawford I* that the findings "adequately support the trial court's conclusion that the segregation in the defendant school district is *de jure* in nature," as quoted above. But the point of this review is not a critique of that court's dexterity with history nor its reading of its own Supreme Court's decisions. The point is that *Crawford II* undid the factual findings of the trial court and then, by its mandate interposed a time straitjacket which made it not feasible to ask the trial court on remand to reopen the *de jure* questions which had supposedly become final in 1976.

The mandate remanded the case to the trial court for further proceedings but only those consistent with the *Crawford II* opinion. It reads:

> The orders of May 19, 1980, and July 7, 1980, are vacated, and the matter is remanded to the trial court for further proceedings consistent with this opinion. It is not our intent to disrupt the operation of the schools during the present semester. Since our decision will not become final for thirty days, the parties have ample time to take whatever legal action they think desirable prior to the commencement of the next school semester. Our previous orders dated August 6, 1980, staying certain features of the trial court's plan, are continued in force until further order of the court.

*Id.* at 656–657, 170 Cal.Rptr. at 510.

The legal action referred to could not be construed as meaning that counsel was free to persuade the trial court that the *Crawford II* court was wrong in holding that *de jure* segregation had not been proved. The mandate spoke to what the parties might do before the mandate came down—thirty days, unless, within that time the Supreme Court of California or the United States Supreme Court should issue a stay or grant hearing. The only steps the parties might take in the interim would be to apply for relief to a higher court prior

to the commencement of the next school semester.

The plaintiffs did indeed seek hearing by the California Supreme Court but hearing was denied them on March 11, 1981, without opinion. The very next day, on March 12, 1981, the remittitur of the California Court of Appeal issued.

In the subsequent hearings, after jurisdiction had been revested in the trial court, there was no feasible way for the plaintiffs or the trial court, had it been so minded, to reopen the trial record. It had all been litigated, and the Court of Appeal had foreclosed any return to that phase.

Herewith is the closing history:

*March 16, 1981,* Board adopts resolution dropping all mandatory aspects of the October, 1980 Plan III.

*March 26, 1981,* plaintiffs moved to enjoin "dismantling" of Plan III.

*April 8, 1981,* hearing on motion by Judge David Eagledon, Judge Egly having now disqualified himself. Plaintiffs' motion is denied.

*April 10, 1981,* plaintiffs appeal denial of preliminary injunction.

*April 14, 1981,* California Court of Appeal denies application for temporary stay.

*April 17, 1981,* Judge Robert Lopez assigned to the case.

*April 23, 1981,* pre-trial conference held; continued to May 13, 1981.

*May 4, 1981,* Board files Statement Present of Status of the Case. Board contends that further litigation of *de jure* issues is precluded by the decision in *Crawford II* because it has held that there was no *de jure* segregation.

*June 15, 1981,* plaintiffs applied for TRO and preliminary injunction against continuing year-round schedules in the minority segregated schools, or placing any additional minority segregated schools on year-round schedule.

*June 17, 1981,* TRO denied.

*June 19, 1981,* Board submits desegregation plan for 1981–1982 school year.

*June 24, 1981,* preliminary injunction denied. Court rules that trial on Board's desegregation plan shall be by written testimony only, and shall be submitted by August 12, 1981.

*August 14, 1981,* all pending matters ordered submitted on August 12, 1981.

*September 10, 1981,* court enters final approval of school board plan and orders discharge of writ of mandate; terminates jurisdiction except for determination of attorneys' fees.

*October 21, 1981,* plaintiffs appeal order of September 10.

*November 25, 1981,* court enters final order terminating jurisdiction after awarding attorneys' fees.

*May 24, 1983,* plaintiffs dismiss appeal from the September, 1981 order.

*Final Conclusions*

The *Crawford* litigation has had few parallels. The Supreme Court of the United States held that segregated public educational schools violate the Fourteenth Amendment.

Los Angeles maintained a public school system which was—and today is—racially segregated.

The plaintiffs sued to require Los Angeles Unified School District to adopt and implement a realistic plan for bringing about a unitary school system.

The plaintiffs won. The trial court found that Los Angeles had been maintaining a dual school system which discriminated against Black children and the children of other racial minorities.

The trial court ordered the school board to prepare for, make a plan for, and begin to bring about a desegregated school system.

The Supreme Court of California upheld the judgment and finding that Los Angeles' segregated system was *de jure* in nature, not merely ill from natural causes.

The trial court determined that segregation in Los Angeles schools was so perva-

sive and ingrained that only by the use of all measures, including pupil assignment and transportation could substantial relief be accomplished. It ordered a mandatory pupil assignment and transportation ("busing") plan into effect.

Resentment against busing and pupil assignment plans culminated in the passage of Proposition I, after one of the ugliest political campaigns in California history. That new law in effect forbade such school plans unless a district were found so deeply segregated as a command of state law, that is *de jure*, that the Fourteenth Amendment would require assignment and busing.

The trial judge held that the plaintiffs had pleaded and proved *de jure* segregation; the court had found *de jure* segregation and the Supreme Court had sustained that finding.

An intermediate appellate court ruled that there had never been *de jure* segregation, and that the trial court could have found its existence only in a "Pickwickian" sense. It set aside the finding, and ordered the case restructured "consistent with" the new light. The finding was not "Pickwickian;" the suggestion is Rabelaisian.

The plaintiffs lost.

Indeed, this is a unique case, a case in which judges awarded victory to the lawful winners. And then the rule-makers changed the rules, and the other judges annulled the victory.

Some of our brothers emphasize the importance of respect for established rules of finality—of res judicata, of issue preclusion. It is ironic that the rules themselves were altered here to set aside that very principle of finality.

The plaintiffs lost their case, but the struggle they fought was neither vain and is not finished. To the extent the present majority decision may make possible another try, in part, I concur. From so much of this court's opinion as gives respect to what I believe to be disgraceful conduct by a great state, I respectfully dissent.

* Panel opinion, 9th Cir., 752 F.2d 356.